# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JOHN DAUSKA,

        Plaintiff,

    v.                                         Case No. 12-C-925

GREEN BAY PACKAGING INC. and
GREEN BAY PACKAGING INC.
SEVERANCE PLAN,

        Defendants.

---

## DECISION AND ORDER PARTIALLY GRANTING
## DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

---

      Plaintiff John Dauska, a former employee of Defendant Green Bay Packaging, Inc. (GBP),

filed this action on September 11, 2012, alleging that GBP discriminated against him and eventually

forced him to retire in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C.

§ 621 *et seq.* (Compl. ¶¶ 31–33, ECF No. 1.) Dauska also claims that GBP and Defendant Green

Bay Packaging Inc. Severance Plan (the Plan), an entity that GBP contends does not exist, failed

to pay him severance benefits in violation of the Employee Retirement Income Security Act

(ERISA), 29 U.S.C. § 1001 *et seq.* (Compl. ¶¶ 35–40.) Although GBP did not have a formal

written severance plan, Dauska asserts that GBP's policies and past practices created a plan subject

to ERISA. The complaint also asserts state law claims for failing to pay wages in violation of

Section 109.03 of the Wisconsin Statutes and breach of an express or implied contract. (Compl.

¶¶ 41–50.) For the reasons stated below, GBP's motion will be granted in part and denied in part.

## I. Background

GBP is a manufacturer of corrugated paper products with headquarters located in Green Bay, Wisconsin. (Def's Proposed Findings of Fact (DPFOF) ¶ 1, ECF No. 38.) Dauska was originally hired by GBP as its Corporate Personnel Director in 1979, and he worked for the company without any written employment contract until February 2011. (*Id.* ¶¶ 2–3, 54.) Dauska contends that he was forced to retire against his wishes at the age of 66 solely because of his age. Prior to his retirement, Dauska acted as the Corporate Director of Industrial Relations and Personnel. (Dauska Dep. at 48:13–14, ECF No. 48-1.) In this role, Dauska's responsibilities included "being chief spokesperson on the company's behalf during the union contract negotiations; and also other labor issues, mediations, arbitrations, contract interpretations . . . ." (*Id.* at 48:17–22.) He had "wide discretion" in his role (*id.* at 59:5–7), but he asserts that GBP began to reduce his job duties in 2005 and transferred many of his duties to other employees in subsequent years. For example, he contends that in 2005, he was stripped of "lead responsibility for the 401(k) plan, the medical and dental benefit plans, and participation in the administration of the pension plans." (*Id.* at 65:4–8.) He also claims that he was denied the title of "Vice President" because of his age. He asserts that when he asked for the title, he was told that the company felt it was not the right time to make company offices. (*Id.* at 131:7–133:20.) Within two months, however, the company gave the title to an employee about ten years younger than Dauska. (*Id.*) Dauska contends he was equally as qualified for the promotion as the younger candidate. (*Id.*) He further submits that during his 32 years at GBP, he was never written up, he consistently received annual pay raises, and he was entered into GBP's deferred compensation plan, an perk available to only a small number of employees. (Pl's Proposed Findings of Fact (PPFOF) ¶¶ 5–8, ECF No. 47.)

In June 2010, GBP General Counsel Scott Wochos, Dauska's immediate supervisor, first approached Dauska about the subject of retirement. (Dauska Dep. at 30:5–10.) Wochos testifies that he approached Dauska about the issue because GBP was "paying him a lot of money to do about a third of a job." (Wochos Dep. at 44:2–5, ECF No. 48-3.) After giving Dauska time to think about retirement, Wochos met with Dauska again in early July 2010. Dauska asserts he informed Wochos he had no interest in retiring in the near future and in response, Wochos told him that if he was not willing to retire, Wochos would eliminate his position. (Dauska Dep. at 233:25–235:5.) Dauska also claims he asked Wochos if he would receive severance and Wochos said that he would not be offered severance. (*Id.* at 233:20–21.) Dauska then asked Wochos if he could speak with GBP President Will Kress about Wochos' decision, and Wochos arranged a meeting. (*Id.* at 235:22–236:10.) Dauska reported to Kress that Wochos gave him the option to voluntarily retire or face the elimination of his job, he expressed that he was upset and believed he was being forced to retire because of his age, and he told Kress that retiring before the age of 66 would be a hardship for him. (*Id.* at 84:18–85:12, 86:9–12.) Dauska asserts that although Kress did not directly comment on Wochos' statements, he described approvingly the philosophy of a former manager who believed that all managers should retire at age 65. (*Id.* at 85:15–21.) Dauska again met with Wochos following his meeting with Kress, and he claims Wochos told him that according to Kress, he agreed to stay on only until his 66th birthday. (*Id.* at 94:7–16.) Dauska states he denied agreeing to retire and informed Wochos that he only told Kress that retirement before age 66 would be a hardship for him. (*Id.*) Dauska testifies that in response, Wochos again said he would eliminate Dauska's position if he did not retire. (*Id.* at 94:22–95:3.) Dauska claims Wochos then indicated he did not have time to talk further about the matter and that the two could pick up the

conversation at a later time. (*Id.* at 93:1–6.) Dauska contends he attempted to schedule appointments through Wochos' administrative assistant on two occasions, but neither attempt resulted in a meeting. (*Id.* at 93:11–18.)

On January 6, 2011, Wochos emailed Dauska: "Confirming our discussions over the past 6-9 months, we have delayed, at your request, the elimination of your position. We will meet your request of last summer that the elimination not take place until February 14, 2011." (Wochos Dep. Ex. 18, ECF No. 48-3.) Dauska's employment ended in February 2011 as scheduled, and on August 1, 2011, he filed an administrative complaint of age discrimination with the Equal Employment Opportunity Commission (EEOC) Chicago District Office. (Weber Decl. Ex. C, ECF No. 41-3.)

## II. Summary Judgment Methodology

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party has the burden of showing there are no facts to support the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In determining whether summary judgment is proper, a court must construe the evidence in the light most favorable to the

non-moving party. *Anderson*, 477 U.S. at 255. There is no genuine issue of material fact, and therefore no reason to go to trial, when no reasonable jury could find in the non-moving party's favor. *Smith v. Lafayette Bank & Trust Co.,* 674 F.3d 655, 657 (7th Cir. 2012).

### III. Analysis

#### A. Age Discrimination

GBP contends Dauska's ADEA claim is time-barred because he failed to file an administrative charge with the EEOC within the requisite period. To pursue a civil action under the ADEA, a Wisconsin plaintiff must file a charge with the EEOC within 300 days after the alleged unlawful conduct occurred. 29 U.S.C. § 626(d)(1)(B); 29 C.F.R. § 1626.7 (". . . [I]n a case where the alleged discriminatory action occurs in a State which has its own age discrimination law and authority administering that law, [a charge must be filed] within 300 days of the alleged discriminatory action, or 30 days after receipt of notice of termination of State proceedings, whichever is earlier."); *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995). The 300-day clock begins to run when the alleged illegal act of discrimination was made—not the date on which the employee was terminated. *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) ("[t]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful.") (citations omitted).

The Seventh Circuit has "adopted an 'unequivocal notice of termination' test to determine the date that an employee has been terminated." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (quoting *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 486 (7th Cir. 2002)). Under this test, "termination occurs when the employer shows, by acts or words, clear

- 5 -

intention to dispense with the employee's services." *Id.* There are two prongs to the test, both of which must be satisfied to fix the date of termination: "First, there must be a final, ultimate, nontentative decision to terminate the employee. . . . Second, the employer must give the employee 'unequivocal' notice of its final termination decision." *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004).

GBP claims Wochos unequivocally communicated a final decision to terminate Dauska in their July 2010 meeting when he offered Dauska two options: retire or your position will be eliminated. If true, Dauska's claim would be time-barred because he waited more than one year to file his EEOC charge. Dauska asserts that "things had been unresolved and left up in the air" after their summer 2010 meetings and that Wochos did not give him a termination date until January 6, 2011. (Pl's Br. at 9, ECF No. 46.)

In support of its argument that Dauska's termination occurred in July 2010, GBP relies on Dauska's own testimony regarding his understanding of his meeting with Wochos at that time:

| Question: | . . . Your supervisor had told you as early as June that he wanted you to be retired or job eliminated in the year 2010, correct? |
|---|---|
| Answer: | In June it – the conversation was strictly "retired." The aspect of job elimination first occurred during our second meeting in July. |
| Question: | Well, when he told you in July that your job was going to be eliminated, it was: You need to retire or your job's going to be eliminated, and it's going to happen in 2010. That was what was told to you, right? |
| Answer: | That is correct. |

(Dauska Dep. at 121:4–16.) GBP argues that Dauska's own account of the July 2010 meeting supports GBP's argument that Wochos' notice of termination was unequivocal. Additionally, following the July 2010 meeting Dauska e-mailed GBP Director of Human Resources Mike

Georgia to say that he was either retiring or having his job eliminated in 2010 and wished to gather information about his retirement benefits. (*Id.* at 96:5–8.) GBP further notes that after Dauska spoke with Kress, he admits Wochos again reiterated that his position would be eliminated if he did not retire. (*Id.* at 94:22–95:3.) In the months preceding Dauska's termination, GBP contends, it did not waiver in its decision:

> Question: Your testimony is that that was the company's position until your actual 66th birthday when you were retired or your position was eliminated, depending on your perspective?
>
> Answer: The position being that –
>
> Question: That you would have to retire or face elimination of your position.
>
> Answer: Yes.
>
> Question: No one ever took it back?
>
> Answer: No one ever took it back.
>
> Question: And you always understood that was going to be the case?
>
> Answer: Yes.

(*Id.* at 95:7–19.) Based on this evidence, GBP contends that Dauska's claim with the EEOC was untimely and his action is therefore barred.

GBP has confused its unequivocal notice of its intent to terminate Dauska if he did not retire with an unequivocal notice of termination. It is the latter that is required in order to trigger the statute of limitations. *See Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 849 (11th Cir. 2000) ("Quite simply, the 180-day charge filing period does not run until the plaintiff is told that she is actually being terminated, not that she might be terminated if future contingencies occur."). Here, the evidence shows that as early as July 2010 GBP threatened Dauska with termination, or more

specifically, elimination of his job, if he did not retire, but it did not provide him unequivocal notice of termination. Indeed, had he elected to voluntarily retire, the company would not have terminated him at all. Nor was it clear and unequivocal when his termination would occur if he did not retire. Wochos originally planned to eliminate Dauska's position in 2010. Following Dauska's meeting with Kress, Wochos expressed his understanding that Dauska had agreed to retire when he turned 66. When Dauska denied any such agreement, Wochos again repeated that Dauska's position would be eliminated if he did not retire, but he did not say when. It was not until January 6, 2011, when Wochos sent Dauska the email telling him that his position would be eliminated on February 14, 2011, that Dauska had unequivocal notice of his termination.

A mere threat to take some job action against an employee is not enough to trigger the statute of limitations under Title VII. If the rule were otherwise, " litigants would be forced to file a charge at every hint of termination in order to preserve their claims" and "[t]he concomitant burden upon the EEOC would impact significantly the enforcement function of the agency." *Flannery*, 354 F.3d at 641. In this case, for example, until Wochos' email telling him that his job was being eliminated on February 14, Dauska had no idea when he would be terminated. Although Wochos believed that he had agreed to retire on his 66th birthday, Dauska denied that he had any such plans. Thus, the question of when his position would be eliminated was left open until Wochos advised Dauska on January 6 that February 14 would be his last day.

Neither *Ricks* nor *Lever* are to the contrary. Both cases involved the allegedly discriminatory denial of tenure. In both cases the courts held that it was the denial of tenure that triggered the statute of limitations, not the termination of employment. The termination of employment was the "delayed, but inevitable, consequence of the denial of tenure." *Ricks*, 449 U.S.

at 257–58.  The denial of tenure in each case constituted an employment action that the plaintiffs in each case alleged was taken for discriminatory reasons.  Notice of that action was enough to trigger the statute of limitations.  In this case, in contrast, GBP took no action against Dauska in July of 2010, and provided no notice of any action affecting his employment until January 2011, when it told him his position would be eliminated on February 14.  It was only then that he was provided unequivocal notice of his termination.  Since his claim was filed within three hundred days of that date, it is timely and need not be dismissed.

As to the merits of Dauska's claim, there are material factual disputes that preclude granting summary judgment on the record as it now stands.  Dauska has offered both direct and circumstantial evidence that, if believed by a jury, could support a finding in his favor.  For example, Dauska argues that Kress made a comment suggesting he thought that all managers should retire at age 65.  Dauska notes that even before he was told to retire or face elimination of his position, his duties were being transferred to younger employees and he was denied the title of vice president despite the fact that it had been awarded to his predecessors.  GBP contends that Dauska was not meeting its legitimate performance expectations, but Dauska has offered evidence from which a jury could conclude otherwise, including the fact that poor performance was not offered as a reason for terminating him until after the litigation commenced.  Based on the evidence presented, the Court is satisfied that the record does not permit judgment as a matter of law.  Accordingly, GBP's motion will be denied as to Dauska's ADEA claim.

### B. ERISA

Dauska contends that through its course of conduct, GBP established an ERISA plan which entitles him to severance pay.  He asserts GBP had an informal policy of paying employees who

had been involuntarily terminated without cause two weeks of severance for each year of service, up to one year of severance pay, and that he was wrongfully denied such a benefit when he was terminated without cause. Before addressing the merits of Dauska's ERISA claim, the Court will address his motion to strike and motion for sanctions.

**1. Motions to Strike and for Sanctions**

The subject of these motions is GBP's discovery obligation to disclose documents related to its past practice of paying severance to employers who were involuntarily terminated without cause. On May 14, 2013, the Court granted in part Dauska's motion to compel and ordered GBP to respond to interrogatories and document requests seeking such information. (ECF No. 18.) Dauska's "Interrogatory No. 1" asked GBP to "identify every person involuntarily separated from employment with [GBP] at any time during the years 2006 through the present and for each such person state the following": (a) name; (b) address/phone; (c) dates of employment; (d) positions held; (e) date of termination; (f) reason for termination; (g) whether person was offered severance; (h) severance amount and manner of calculation; (i) amount actually paid. GBP supplemented its answer to the interrogatory following the Court's May 2013 order by producing "Exhibit B," a spreadsheet listing former employees who had entered into severance agreements which contained columns for division, separation date, employee name, and age. (*See* 7/8/13 Suppl. Answers, ECF No. 51-1.) GBP also stated in its supplemental response that it had "collected and produced the payroll files maintained regarding the employees listed in Exhibit B . . . . These are the files that would contain copies of the Severance Agreements entered into by the employees listed on Exhibit B and contain other available and responsive information to the subparts of this interrogatory." (*Id.*) Dauska construed GBP's response to mean that instead of providing a written response to

subparts (a)–(i) in Interrogatory No. 1, GBP was producing the employee files, which contained all responsive information to the interrogatory.

Dauska contends that at least 35 of the employee files GBP produced did not provide a start or end date, and that without this information, he was unable to calculate years of service for all employees listed in Exhibit B. Dauska asserts that GBP "knowingly and purposely" withheld this information but then used it to support its own summary judgment materials. In support of its motion for summary judgment, GBP submitted the declaration of James M. Ledvina, an attorney for GBP who attested to making the following calculations:

> 5. Of the 159 involuntary office/administrative employee separations from February 2006 to 2011 shown on GBP's discovery responses, 130 (or 81.76%) received severance.
>
> 6. During the same period of time set forth above, I calculated the percentage of employees who received between one to two weeks of severance for every year of service and the percentage of employees who received exactly 2 weeks of severance for every year of service. Of the 130 office and administrative employees who did receive severance, 62 employees (or less than half) received between one to two weeks of severance for every year of service. Of the 130 office and administrative employees who did receive severance, only three employees received exactly two weeks of severance for every year of service.

(Ledvina Decl. ¶¶ 5–6, ECF No. 40.) In Paragraph four of his declaration, Ledvina referenced the Declaration of Scott Wochos, who attested that to assist Ledvina, GBP created a summary of severance information form the payroll and personnel files GBP had produced. (Wochos Decl. ¶ 12, ECF No. 39.) GBP then utilized the facts summarized by Ledvina in Proposed Facts 88–90 and its supporting memorandum. (ECF Nos. 37 & 38.) Dauska contends that Ledvina could not possibly have made such calculations unless GBP withheld information regarding start and end dates. He further contends that GBP's statements are improper because GBP failed to provide

Dauska or the Court the information Ledvina claims to have reviewed, and that in any event, it appears Ledvina relied on a previously produced list of all GBP employees (Exhibit AA) instead of the most updated version, a document labeled GBP06671-06703. Dauska moves the Court to sanction GBP pursuant to Fed. R. Civ. P. 37(b)(2)(A) by: (1) prohibiting GBP from opposing Dauska's claim that involuntarily terminated office and administrative employees received two weeks of severance per year of service up to a year, and that vice presidents received two years of severance pay; and (2) striking the Declaration of James Ledvina and GBP's proposed facts 88–90. He also seeks attorney's fees pursuant to Fed. R. Civ. P. 37(b)(2)(C).

GBP characterizes Dauska's motions as a misguided attempt to capitalize on an inadvertent mistake. GBP explains that as part of its supplemental response to Interrogatory No. 1, GBP produced more than one hundred payroll and personnel files, and Wochos, the GBP employee responsible for responding to the request, mistakenly assumed that GBP's electronic human resource system was duplicative of GBP's paper files. (Wochos Decl. ¶ 4, ECF No. 54.) GBP contends that it utilized the electronic system to compile the data analyzed by Ledvina and was unaware that some of the paper files no longer contained records of start and end dates. After Dauska filed his motion to strike, GBP recognized its error and provided Dauska a chart that provided the dates he was missing. (Georgia Decl. ¶ 7, ECF No. 55.) GBP argues that Dauska's motions are untimely because he has had the personnel files for over a year, and given his knowledge of HR procedures, he should have known that missing start and end dates could have been located in the electronic system. In addition, GBP contends that Dauska suffered no prejudice from GBP's late disclosure of the dates. After GBP provided the missing dates on May 6, 2014, Dauska did not challenge the factual assertions in paragraph 6 of Ledvina's declaration involving

years of service.  Further, GBP contends that presenting information in summary form, as it did in Ledvina's declaration, was proper given the volume of information in this case.  GBP also notes that Dauska possessed the information Ledvina relied upon in his calculations and that Dauska could have raised any factual or mathematical objection in his response to the summary judgment motion.

The Court will deny both motions.  There is no evidence that GBP intentionally removed information from the paper files or knew that some of the files lacked start and end dates.  GBP's explanation as to why it failed to produce the information is credible, and it is implausible that GBP would have knowingly obscured information and then blatantly relied upon that information in its summary judgment motion.  Parties seeking to conceal or spoliate evidence typically do not cite the missing evidence and call attention to their transgressions.  Although GBP erred in assuming that the paper files contained the same information as its electronic system, GBP acted quickly to supplement the missing information when Dauska filed his motion to strike.  Dauska's request that the Court prohibit GBP from opposing his claim that GBP employees received two weeks of severance per year of service is puzzling under the circumstances.  Dauska does not contend that evidence has been permanently spoliated, and as of May 6, 2014, Dauska has possessed all the information he would need to compare the amount of severance pay each employee received to his or her years of service in the company.  Despite possessing all the information Ledvina relied upon in paragraph 6 of his declaration, Dauska did not challenge Ledvina's factual assertions in his motion to strike or motion for sanctions and has not sought leave to supplement his summary judgment materials.  His failure to do so suggests that he has not found mistakes in calculation, and the Court is not inclined to prohibit GBP from making an argument when the facts supporting that

argument are readily available to both parties.

Further, the Court does not find sanctions appropriate for GBP's alleged failure to provide Dauska or the Court with the materials underlying Ledvina's calculations in paragraphs 5 and 6 of his declaration. The data underlying the calculations (both Exhibit AA and GBP06671-06703) had been produced to Dauska, and he could ascertain which documents GBP relied upon in making the calculations. As GBP notes, Ledvina's calculations involved nothing more than basic arithmetic operations and were based on the data of fewer than 160 employees. Dauska had the opportunity to challenge Ledvina's factual assertions, which he did with respect to paragraph 5 of the declaration in his summary judgment materials. GBP's failure to provide summary spreadsheets with its summary judgment materials under the circumstances is not a sanctionable offense and does not warrant striking Ledvina's declaration or GBP's proposed facts. Additionally, as for Dauska's claim that Ledniva's calculations were erroneously based on Exhibit AA instead of GBP06671-06703, GBP has demonstrated that this was inconsequential. Ledvina's supplemental declaration indicates that using GBP06671-06703, he calculates that 81.01% of GBP employees received severance, which is actually lower than the 81.76% GBP initially calculated using Exhibit AA. (Ledvina Decl. ¶ 6, ECF No. 56.)

In sum, although Dauska was justified in seeking the missing data from GBP, the problem was quickly remedied and Dauska has failed to show (or even assert) that the missing data supports his arguments on the merits. Additionally, Dauska has failed to demonstrate that Ledvina's declaration and GBP's proposed facts rely on data that Dauska does not possess. Dauska's motion for sanctions and motion to strike are therefore denied, and his request for attorney's fees is also denied. The Court now proceeds to address the merits.

## 2. Severance Benefits Claim

ERISA imposes fiduciary duties on employers that establish or maintain an employee benefit plan such as a severance plan. *See* 29 U.S.C. § 1002(1)(b); *Id.* § 186(c). Although employee benefit plans must be in writing, 29 U.S.C. § 1102(1), the courts have held that there need not be a writing in order for a plan to exist. *Brines v. XTRA Corp.*, 304 F.3d 699, 701 (7th Cir. 2002) ("[C]ourts reason that a failure to comply with that requirement should not redound to the company's benefit."). In *Donovan v. Dillingham*, the Eleventh Circuit set out the prevailing test for determining whether a "plan" has been established within the meaning of ERISA:

> In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.

688 F.2d 1367, 1372 (11th Cir. 1982). The Seventh Circuit joined a host of other circuits by adopting this test in *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 812 (7th Cir. 1994). In *Diak*, plaintiff Diak worked at an accounting firm and was never told that the firm had a pension plan. *Id.* at 810. Diak then discovered after he retired that the firm had paid pension benefits to some retired employees. *Id.* Specifically, he discovered that a retiree with 16 years of service received $75/month plus medical and dental coverage, a retiree with 36 years of experience received $100/month and dental insurance, a retiree with five years of experience received medical and dental insurance, and a retiree with 55 years of experience received $1,000/month. *Id.* Diak brought an ERISA claim asserting that the firm administered a "plan" under which he was entitled to benefits. *Id.* The firm argued that the pension payments were not made pursuant to a "pension plan" and instead were individual contracts executed upon each person's retirement. *Id.* at 811. Applying the *Donovan* criteria, the court held that the terms of the alleged plan were not

ascertainable by a reasonable person, explaining:

> Few DCK retirees received any benefits, and the benefits paid were clearly not calculated according to an established plan, but rather represented ad hoc arrangements with each individual. With only this evidence, we could not begin to fashion appropriate relief for Diak, since we do not know whether he was the type of employee DCK intended to cover, or what benefits are due. We also note that there was no evidence that Diak expected a pension; rather, he was expressly told in 1985, just before he "retired," that DCK had no pension plan.

*Id.* at 813.

As the Court observed in its May 2013 order, several courts, including the Seventh Circuit, have recently questioned whether the *Donovan* approach is compatible with two subsequent decisions of the Supreme Court that emphasize different considerations when determining whether an informal policy is a "plan." (ECF No. 18.) In *Fort Halifax Packing Co. v. Coyne*, the Court addressed a statute providing that "any employer that terminates operations at a plant with 100 or more employees, or relocates those operations more than 100 miles away, must provide one week's pay for each year of employment to all employees who have worked in the plant at least three years." 482 U.S. 1, 5 (1987). The Court held that the statute did not create plans subject to ERISA because "the requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control." *Id.* at 12. Courts have gleaned from *Fort Halifax* that "an ERISA plan requires an ongoing administrative scheme." *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1374 (7th Cir. 1997). In *Massachusetts v. Morash*, the Court addressed whether a bank's policy of paying unused vacation time out of its general funds constituted an ERISA plan. 490 U.S. 107, 110 (1989). The Court explained:

In enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds. . . . To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator. Because ordinary vacation payments are typically fixed, due at known times, and do not depend on contingencies outside the employee's control, they present none of the risks that ERISA is intended to address.

*Id.* at 115 (citation omitted). Thus, in *Morash* the Court looked more to the purposes of ERISA and considered whether employee expectations would be defeated if ERISA did not apply.

In *Sandstrom v. Cultor Food Science, Inc.*, the Seventh Circuit noted that "[b]oth *Morash* and *Fort Halifax* evince reluctance to find that regular and predictable awards of severance or vacation payments establish a 'plan,' given the frequency with which these benefits are the subject of bilateral negotiations between employers and departing employees." 214 F.3d 795, 797 (2000); *accord Golden Gate Restaurant Ass'n v. City & County of San Francisco*, 546 F.3d 639, 652 (9th Cir. 2008). Similarly, in *Brines*, the court cited *Sandstrom* and *Morash* for the proposition that it may be "better to describe informal plans as simple contracts, enforceable under state law rather than under ERISA." 304 F.3d at 702. The court observed that there is "a fair bit of judicial skepticism about 'informal plans'—specifically whether by allowing their concoction by imaginative counsel in litigation employers will actually be deterred from offering certain types of benefit." *Id.* (citing *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 403 (6th Cir. 1998) ("For us to sanction informal 'plans' or plan 'amendments'—whether oral or written—would leave the law of employee benefits in a state of uncertainty and would create disincentives for employers to offer benefits in the first place.")). *Sandstrom* and *Brines* did not explicitly overrule *Diak*, however, and an employer's informal benefit scheme may still constitute an ERISA plan in this Circuit. Nevertheless, the cases following *Donovan* and *Diak* counsel that in assessing alleged informal

plans, courts should be cautious not to impose ERISA requirements on employers who exercise discretion in severance decisions and create no expectation of entitlement to severance pay. *See Brines*, 304 F.3d at 704 ("The normal understanding of severance pay (when not provided for in a written plan), as of bonuses, is that it is at the discretion of the employer.").

Here, Dauska asserts that GBP had an informal severance plan and that the terms of the informal plan entitle him to benefits under the plan. Like the plaintiff in *Diak*, his claim is not based upon a direct promise of severance. Dauska had no written contract containing a severance provision, and he does not recall anyone at GBP making an express promise that he would receive severance under any circumstances. (Dauska Dep. at 164:4–8.) As noted above, Dauska asserts Wochos informed him in their July 2010 meeting that he would not receive severance pay. (*Id.* at 233:20–21.) GBP contends that its severance agreements were ad hoc agreements with outgoing employees and that GBP created no expectation of severance. GBP Chief Financial Officer Joseph Baemmert acknowledges that the company paid severance to many employees but asserts that severance decisions were made "on a case-by-case basis" by the outgoing employee's immediate ranking supervisor. (Baemmert Dep. at 69:15–19, ECF No. 48-4.) GBP contends that Dauska was not a fitting candidate for severance pay because he was allowed to stay employed from July 2010 to February 2011 even though GBP desired to eliminate his position sooner and because at age 65, he was already fully eligible for GBP's pension plan. Wochos claims he did not want to "create a precedent of offering severance to people who were a hundred percent pension eligible," (Wochos Dep. at 70:22–24), and that to his knowledge, "GBP has never paid severance to a departing employee who was allowed to pick a separation date six months after the company wanted to end his employment and who was fully eligible for his or her pension benefits." (Wochos

Decl. ¶ 11, ECF No. 39.)

The parties primarily dispute whether the intended benefits and beneficiaries are ascertainable to a reasonable person and whether Dauska was in the class of intended beneficiaries. To support his claim, Dauska first points to his own experience and testimony of GBP executives. During Wochos' tenure, Dauska would be notified when an employee who was "qualified to receive severance" was going to be terminated, and then he would put together documents for Wochos' review. Wochos would then give the documents back to Dauska, and he would present them to the affected individual. (Dauska Dep. at 170:20–171:4.) Dauska testified that the company's most recent policy had been to offer two weeks of severance for every year of service, not to exceed one year, with the exception of company vice presidents, who were granted two full years of severance. (*Id.* at 171:5–11.) Dauska also claims to lack knowledge of any employee whose employment was involuntarily terminated and who did not receive severance. (*Id.* at 209:4–7.) Baemmert also testified that although the starting point is "zero to one week" of severance, all the severance packages he had personally seen were offers of 1 to 2 weeks of severance pay. (Baemmert Dep. at 70:15–71:11.) Baemmert could not recall the name of a former employee who had been terminated without cause and did not receive a severance package. (*Id.* at 85:1-4.)

Second, Dauska contends that GBP's past practices reveal a plan with ascertainable terms. Dauska rejects GBP's assertion that 130 of 159 employees involuntarily terminated by GBP (or 81.76%) received severance. Of the 29 employees identified as receiving no severance, Dauska has submitted documents demonstrating that six resigned (and should be subtracted from the 159), six actually received some amount of severance, and seven were terminated for cause or misconduct. Of the remaining 10 employees, Dauska asserts that two employee files were lost or destroyed in

a flood and the other eight do not state a reason for termination. (Weinstein Decl. ¶¶ 3–8, ECF No. 49-1.) Wochos testified that one of the employees whose file was destroyed was terminated for performance reasons. (Wochos Dep. at 145:16–146:1.) Dauska therefore contends that in reality, at most, only nine of 153 employees terminated without cause (5.9%) did not receive severance. Dauska further questions whether those nine were terminated without cause because no reason for termination stated in the files.

Third, Dauska asserts that a reasonable person can readily ascertain the plan's essential terms from a memorandum regarding severance agreements sent by Wochos to "All General Managers," "HR Personnel," and Dauska on September 5, 2008. The memo stated:

> To avoid any confusion as to when severance agreements are necessary for terminated employees, please contact me by phone or e-mail. In almost all cases, written severance agreements are required if a terminated employee is given more than two weeks of severance pay.
>
> With the exception of accrued vacation or other earned time off, there is no legal requirement to provide severance pay. Generally, it has been the Company's practice to provide one to two weeks of severance pay per year of service for employees who are involuntarily terminated without cause. In exchange for severance pay beyond two weeks, the Company requires a written release of all claims under state and federal law and other written commitments from the employee.
>
> We have several different templates for severance agreements, so please contact me whenever you believe a terminated employee should be paid more than two weeks of severance pay and I will promptly provide you with a draft agreement. . . .

(Dauska Dep. Ex. 13, ECF No. 48-1.) Dauska contends that from this memo, a reasonable person can ascertain the plan's intended benefits (1-2 weeks of severance per year of service) and beneficiaries (employees terminated without cause).

For an informal plan to constitute an ERISA plan, *Diak* instructs that the terms of the plan must be ascertainable by a reasonable person. 33 F.3d at 812. In *Brines*, the Seventh Circuit

likened this requirement to the well-established principle that vague contracts are unenforceable. 304 F.3d at 701 ("A court will not enforce a contract that is so vague that the court rather than the parties would have to formulate essential terms."). Here, Dauska's claim fails to satisfy *Diak* because a reasonable person cannot ascertain the intended benefits and beneficiaries of the alleged plan. Regarding intended benefits, under *Diak* "a plaintiff need not show the exact dollar amount [he] would expect to receive in benefits," but "there must be some evidence in the record from which the court can ascertain the benefits due under a plan." 33 F.3d at 812. Dauska's testimony that GBP had a policy of paying two weeks of severance for every year of service, up to one year of severance, as well as the memo stating a general practice of paying 1-2 weeks per year of service, are contradicted by the undisputed factual assertions in paragraph 6 of Ledvina's declaration. Ledvina calculated that "[o]f the 130 office and administrative employees who did receive severance, 62 employees (or less than half) received between one to two weeks of severance for every year of service. Of the 130 office and administrative employees who did receive severance, only three employees received exactly two weeks of severance for every year of service." (Ledvina Decl. ¶ 6, ECF No. 40.) Since over half the employees terminated without cause received either more or less than 1-2 weeks of severance per year of service, a court could not begin to fashion a remedy for Dauska, assuming he were in the intended class of beneficiaries. Dauska has not proposed any explanation as to why so many employees fall outside the 1-2 week category, and thus, even if he is correct that almost all (or all) of the 153 employees GBP identified received severance, a reasonable person could not determine whether Dauska's individual circumstances warrant a high-end or low-end severance package (or any severance at all). If there is no identifiable pattern or formula, this indicates that the severance agreements were ad hoc

arrangements rather than disbursements made pursuant to a plan. *Diak*, 33 F.3d at 813.

Additionally, a reasonable person could not ascertain the intended class of beneficiaries and whether Dauska falls within that class. Wochos' memo uses the term "generally" and does not foreclose the possibility that an employee terminated without cause will not receive severance. As noted above, Dauska continued to work for more than six months after the decision was made to terminate his employment and he was already eligible to collect his full pension. The fact that Dauska was eligible for his full pension is especially significant because the general understanding of severance pay is that it is "intended to tide an employee over while seeking a new job," *Sly v. P.R. Mallory & Co., Inc.*, 712 F.2d 1209, 1211 (7th Cir. 1983) (quoting district court), and is not intended to provide a "double windfall recovery," *Jung v. FMC Corp.*, 755 F.2d 708, 713 (9th Cir. 1985). There is evidence that GBP also had this understanding of severance pay, as the company had a policy of reducing a severance award if the individual obtained unemployment compensation. (*See, e.g.*, Severance Agreement of Brett M. Chambers at 1, Weinstein Decl. ¶ 5, Ex. 3, ECF No. 49-1 ("Should you receive any unemployment compensation for the salary continuation period, your salary continuation will be reduced in the amount of such compensation.").) Dauska points to examples of employees who worked after receiving notice of termination or were near retirement age but still received a severance offer: Karen Szczepanski was informed in April 2010 that her position would be eliminated in September 2010 but she still received one year of severance (Baemmert Dep. at 52:19–56:21; Baemmert Dep. Ex. 3); Debra Stevens was informed in September 2009 that her position would be eliminated in December 2010 but she still received one year of severance (Wochos Dep. at 121:9–122:13; Wochos Dep. Ex. 13); Terry Lyon was informed in March 2009 that his position would be eliminated in June 2009 and he still received one year of

severance (Weinstein Decl. ¶ 13, Ex. 6); Robert Tackett was informed in August 2009 that his position would be eliminated in October 2009 but he still received nine months of severance, and because he was eligible for retirement, he also collected his pension (Wochos Dep. at 131:23–132:2; Wochos Dep. Ex. 21); Jeff Rusk was informed in September 2007 that his employment would be terminated in December 2007 and he was offered the option of early of retirement or severance (Weinstein Decl. ¶ 12, Ex. 5.); and three employees—Brian Duffy, Ken Wiese, and Robert Pace—were offered severance until they reached age 62 and were eligible to collect their full pensions (Wochos Dep. at 136:13–16, 140:3–12, Weinstein Decl. Ex. 9). (*See* Pl's Resp. to DPFOF ¶¶ 63–64, ECF No. 47.)

These examples provide evidence that the characteristics at issue—working additional months and being pension-eligible—did not categorically exclude an individual from consideration for severance, but they do not support Dauska's claim nearly as much as he suggests. Only one of the employees listed above received severance and a pension simultaneously; in the other cases, GBP gave the employee the option of severance or early retirement or GBP paid severance as a bridge until the employee's pension kicked in. Thus, it appears GBP typically used severance for the traditional purpose of bridging a gap, sought to avoid windfall bonuses, and considered an employee's unique circumstances when constructing a severance offer. Although Robert Tackett received both severance and a pension, there is no evidence that Tackett's offer was typical for pension-eligible employees. Dauska does not provide the ages of the 9 individuals he concedes may not have received severance, and it is unclear how many of the 153 employees identified had reached retirement age when their severance decisions were made. In other words, Dauska has not offered evidence of an identifiable trend, and a single example cannot support the inference that

GBP paid severance to *all* employees terminated without cause. It would be unreasonable, and contrary to the purposes of ERISA, to bind GBP to a policy of paying severance to all pension-eligible employees solely because it had done so on one prior occasion. *See Jung*, 755 F.2d at 713 ("[P]olicy considerations behind ERISA suggest that double recovery should not be favored" because employers must keep their plans within reasonable cost).

Dauska's claim also fails because, as in *Diak*, there is no evidence that GBP ever intended to communicate the existence of a plan to a class of beneficiaries. 33 F.3d at 813; *see also Morash*, 490 U.S. at 115 ("[ERISA] established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's *expectation of the benefit* would be defeated through poor management by the plan administrator.") (emphasis added); *Gruber v. Hubbard Bert Karle Weber, Inc.*, 159 F.3d 780, 789 (3d Cir. 1998) ("[T]he crucial factor in determining whether a 'plan' has been established is whether the employer has expressed an intention to provide benefits on a regular and long-term basis."). Dauska points to Wochos' memo as creating an expectation to severance, but as GBP notes, the express purpose of the memo was to instruct managers and HR personnel on procedure, not to communicate the existence of a plan to a class of beneficiaries. Dauska was privy to the contents of the memo based on his position with the company, but the memo was not circulated to all GBP administrative employees. *Cf. id* ("[T]here was evidence that the individual employer plans satisfied the . . . test for establishing an ERISA plan because each employee was given a copy of the summary plan description which indicated what benefits were available, which persons were eligible for coverage, the source of financing, and the procedures for receiving benefits."). GBP's individual severance agreements also contained confidentiality clauses and were considered confidential by GBP. (Dauska Dep. at

187:4–7.) Thus, the terms of GBP's "plan," and perhaps the very existence of severance packages, would not have been ascertainable by non-management employees. The evidence suggests that GBP sought to preserve its ability to exercise discretion in severance decisions; it made no express promises of severance and did not publish a formal plan. As in *Brines*, the Court finds no reason to upset the traditional understanding that severance pay, absent a written agreement, is at the discretion of the employer. 304 F.3d at 704.

Because Dauska's claim fails under *Diak*, the Court need not consider whether GBP's severance agreements created an "ongoing administrative scheme" under *Fort Halifax*. One final point merits consideration, however. In addition to the reasons stated above, Dauska's claim also fails because there was no contract "implied in fact" between Dauska and GBP. In *Brines*, a class of plaintiffs sued former employer XTRA under ERISA after XTRA transferred part of its business to ContainerPort. 304 F.3d at 700. The employees were offered the same employment by ContainerPort on essentially the same terms, but they claimed an entitlement to severance benefits from XTRA. *Id.* XTRA's previous written severance plan contained a severance formula, but prior to the transfer that plan was superceded by another which provided only that XTRA "will develop and implement an appropriate separation program if business and economic conditions necessitate a reduction in force." *Id.* The plaintiffs noted that after the old plan was superceded, XTRA continued to pay severance benefits to terminated employees according to the old formula, and they argued that this ongoing practice constituted an informal successor plan. *Id.* at 702. XTRA's executives stated that the practice only applied to employees not offered comparable positions by XTRA's affiliates. *Id.* The court held that XTRA's statements did not constitute an admission of a severance benefit plan; rather, they were "merely descriptions of an acknowledged practice." *Id.*

at 703.

The court concluded that "a practice does not create an obligation under the principles of contract law (the principles normally and here applicable to teasing out the obligations created by a pension or welfare plan governed by ERISA) unless it creates a contract 'implied in fact.'" *Id.* The court defined a contract implied in fact as "one in which behavior takes the place of articulate acceptance." *Id.* (discussing *Hobbs v. Massasoit Whip Co.*, 158 Mass. 194, 33 N.E. 495 (1893) (Holmes, J.), a case in which the plaintiff (a seller of eel skins) had by reason of his previous dealings with the defendant (a purchaser of eel skins) good reason to believe that the defendant would either pay for or return a shipment of eel skins). Applying the principles of contract law, the court concluded that no contract implied in fact had been created: "The plaintiff . . . a supplier of labor . . . did not 'offer' to work in exchange for a promise of severance pay, and the defendant did not 'accept' the 'offer' by paying severance pay to other employees." *Id.* at 704. The same analysis applies here. There is no evidence that Dauska and GBP had previous dealings that could be construed as an "offer" of severance by GBP. Dauska does not claim he was terminated by GBP under similar circumstances on a prior occasion and received severance; instead, he again points to GBP's dealings with others. In effect, Dauska seeks "to use [GBP's] practice of paying severance pay not to explicate a contract but to create one." *Id.* at 703. Although GBP had a general policy of paying severance and had paid it to other employees, this did not create an implied contract between Dauska and GBP. Dauska's ERISA claim therefore fails as a matter of law.

### C. State Law Claims

The ERISA analysis above also disposes of Plaintiff's state law claims for breach of an express or implied contract and failing to pay wages in violation of Section 109.03 of the Wisconsin

Statutes.  As discussed above, Dauska had no express or implied in fact contract with GBP entitling him to severance pay.  Section 109.03 of the Wisconsin Statutes provides that employers must pay discharged employees wages (including severance pay) owed to them within a certain period of time.  *See* Wis Stat. §§ 109.01(3), 109.03(2).  Since GBP had no contractual obligation to pay severance to Dauska, this claim also fails as a matter of law.

## IV. Conclusion

For the foregoing reasons, GBP's motion for summary judgment (ECF No. 36) is GRANTED in part and DENIED in part.  The motion is granted as to Dauska's ERISA and state law claims.  It is denied as to his ADEA claim.  Dauska's motion to strike the declaration of James M. Ledvina and Proposed Facts 88–90 (ECF No. 45) and his motion for sanctions against GBP for failing to produce certain discovery materials (ECF No. 51) are DENIED.  The Clerk is directed to set this matter on the Court's calendar for a Rule 16 conference to address further scheduling. The parties may appear by telephone.

**SO ORDERED** this __5th__ day of August, 2014.

s/William C. Griesbach_____
William C. Griesbach, Chief Judge
United States District Court

- 27 -